UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LAURIE A. BODE, and MICHAEL D. NORRIS, individually and as parents and guardians of MAKOTA Z. NORRIS, a deceased minor,<br><br>Plaintiffs,<br><br>v.<br><br>PARKVIEW HEALTH SYSTEM, INC., and WHITLEY MEMORIAL HOSPITAL, INC., d/b/a PARKVIEW WHITLEY HOSPITAL,<br><br>Defendants. | CAUSE NO. 1:07CV0324 RL |

**MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

**I. Statement of Material Facts**

Laurie Bode and Michael Norris, parents of Makota Norris, deceased, have brought this wrongful death action alleging that Parkview Whitley Hospital, in providing Emergency Department services to Makota on December 26, 2005, violated the requirements of the Emergency Medical Treatment Act, codified at 42 U.S.C. § 1395dd ("EMTALA"). (Plaintiffs' Complaint, paragraphs 21-23). Specifically, they allege that the hospital violated EMTALA by failing to provide an appropriate medical screening examination to Makota or, in the alternative, that Makota was diagnosed with an emergency medical condition and the hospital failed stabilize him or transfer him to another medical facility. (Plaintiffs' Complaint, paragraphs 21-22). They seek damages as a result of the alleged violation of EMTALA. (Plaintiffs' Complaint, paragraphs 23-27).

1

In addition to this claim, plaintiffs have filed a medical malpractice claim against the hospital and others before the Indiana Department of Insurance as required by the Indiana Medical Malpractice Act, Ind. Code § 34-18-1-1. (Exhibit 9, Plaintiffs' Proposed Complaint). As in the present action, they seek damages in the medical malpractice claim for the wrongful death of Makota. (Exhibit 9, Plaintiffs' Proposed Complaint, paragraphs 26-28).

Makota was born on September 29, 1999. Michael Dick, MD was his pediatrician. (Exhibit 5, Laurie Bode deposition, page 6, line 25-page 7, line 1). He was born with a heart defect and was deaf. (Exhibit 5, Laurie Bode deposition, page 6, lines 21-22; page 7, lines 4-7). As he developed, he had trouble gaining weight (Exhibit 5, Laurie Bode deposition, page 7, lines 20-25); and had numerous respiratory and sinus infections that brought him to the hospital. (Exhibit 5, Laurie Bode deposition, page 7, lines 14-19).

Makota also had severe developmental delay. By the age of six, he could not talk (Exhibit 5, Laurie Bode deposition, page 13, lines 15-16); had to use a walker in order to walk (Exhibit 5, Laurie Bode deposition, page 15, lines 2-8); needed help in order to shower, dress and eat (Exhibit 5, Laurie Bode deposition, page 15, lines 16-25, page 16, lines 1-25); and was still wearing a diaper. (Exhibit 5, Laurie Bode deposition, page 17, lines 17-18).

At approximately 4 pm on December 26, 2005, Makota started vomiting and having diarrhea. (Exhibit 5, Laurie Bode deposition, page 10, lines 1-16). Prior to that time, he had been well. (Exhibit 5, Laurie Bode deposition, page 10, lines 5-11). His

mother, Laurie Bode, decided to take him to Parkview Whitely Hospital to be evaluated. (Exhibit 5, Laurie Bode deposition, page 10, lines 15-16).

Makota arrived with his mother at the Emergency Department at Parkview Whitely Hospital at approximately 6:10 pm that day. (Exhibit 6, Parkview Whitely Hospital Record). Upon arrival, Nurse Terrie Eber took the following history from the patient's mother: "Patient's mother states patient has had diarrhea and vomiting since 4:30 pm this afternoon. Patient's mother gave antiemetic suppository prior to arrival." (Exhibit 4, Terrie Eber deposition, page 19, lines 11-17, Exhibit 6, Parkview Whitley Hospital Record). Nurse Eber weighed Makota. He weighed 14.6 kilograms or 32.1 pounds. (Exhibit 6, Parkview Whitely Hospital Record). She then took his vital signs which showed a pulse of 102, respirations of 22 and a temperature of 97.5. (Exhibit 4, Terrie Eber deposition, page 19, lines 11-17; Exhibit 6, Parkview Whitely Hospital Record ).

She next assessed Makota's neurological status. He was found to be alert and oriented. (Exhibit 4, Terrie Eber deposition, page 60, lines 15-22; Exhibit 6, Parkview Whitely Hospital Record). His neurological level was then assessed using the Glascow Coma Scale and Nurse Eber found him to have a score of 15 out of 15 which is the highest or best score available. (Exhibit 4, Terrie Eber deposition, page 60, lines 23-25; page 61, lines 1-8, Exhibit 6, Parkview Whitely Hospital Record). Finally, she assessed his skin as being, pink, warm and dry. (Exhibit 4, Terrie Eber deposition, page 61, lines 7-20, Exhibit 6, Parkview Whitely Hospital Record).

Parkview Whitley Hospital has a policy that blood pressures do not need to be routinely taken on children under six years of age. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 11). While Makota was six years and three months of age, he could not talk, was in a diaper and weighed only 32 pounds. (Exhibit 4, Terri Eber, RN deposition, page 62, lines 6-25; page 63, line 1). Terrie Eber, R.N., did not take his blood pressure because she thought he was less than six years old due to his appearance. (Exhibit 4, Terri Eber, RN deposition, page 62, lines 6-25; page 63, line 1).

When Nurse Eber was finished with her nursing assessment, David Hurley, MD, the Emergency Department physician on duty at that time, came into the room to evaluate Makota. (Exhibit 5, Laurie Bode deposition, page 22, lines 16-18). Dr. Hurley took his own history from the mother and performed a physical examination. (Exhibit 2, Affidavit, David Hurley, MD, paragraph 4). The details of his history and examination are set out in his Emergency Department Note. (Exhibit 6, Parkview Whitely Hospital Record). Following his examination of the patient, Dr. Hurley ordered blood tests and a chest x-ray. (Exhibit 2, Affidavit, David Hurley, MD, paragraph 4).

While he was awaiting the results of these tests, Dr. Hurley's shift came to an end and he was replaced by Joachin Okafor, MD. (Exhibit 2, Affidavit, David Hurley, MD, paragraph 5). Before Dr. Hurley transferred the care over to Dr. Okafor, MD, he advised Dr. Okafor of the history, physical examination and the tests that had been ordered. (Exhibit 2, Affidavit, David Hurley, MD, paragraph 6).

In addition to speaking with Dr. Hurley, Dr. Okafor reviewed the chart in order to become familiar with the patient's condition. (Exhibit 3, Affidavit, Joachin Okafor MD,

paragraph 4). He also examined the patient. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 4).

Makota vomited once while in the Emergency Department. (Exhibit 4, Terrie Eber, R.N. deposition, page 31 lines 5-15). He did so into a towel that his mother had brought with her. (Exhibit 4, Terrie Eber, R.N. deposition, page 31 lines 5-15). For this reason, Nurse Eber was unable to measure how much he had vomited. (Exhibit 4, Terrie Eber, R.N. deposition, page 31 lines 5-15). He also had a single episode of diarrhea in the Emergency Department and did so into a diaper. (Exhibit 4, Terrie Eber, R.N. deposition, page 25 lines 14-18). The diarrhea appeared to have some blood in it so Dr. Okafor ordered a stool culture to test for the presence of infection. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 6). However, the results of the stool culture would not be available until the following day. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 6).

When the results of the x-ray and blood tests were available, he reviewed them and made a diagnosis of acute gastroenteritis. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 7). He did not think that this was an emergency medical condition. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 10). Before deciding upon a plan of care, Dr. Okafor decided to speak with Makota's pediatrician, Dr. Dick, to discuss with him his evaluation, vital signs, the results of lab work and the presence of the bloody stool. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 8).

Dr. Dick agreed with his diagnosis but added salmonella as a possible diagnosis. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 10). Dr. Dick recommended that

Dr. Okafor give Makota a dose of the antibiotic Rocephin and that he discharge Makota with instructions to have the mother bring Makota to see Dr. Dick first thing in the morning. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 8). Additionally, the mother was instructed to encourage Makota to drink as much Pedialyte has he could tolerate and to bring him back to the Emergency Department immediately if he had any problems. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 9). It is Dr. Okaor's opinion that Makota left the hospital in a stable condition. (Exhibit 3, Affidavit, Joachin Okafor MD, paragraph 11). The details of his care of Makota are set out in his Emergency Department Note. (Exhibit 6, Parkview Whitely Hospital Record).

Makota and Laurie left the Emergency Department at 9:30 pm. (Exhibit 6, Parkview Whitely Hospital Record). They arrived home around 10:00 pm and Laurie put Makota on a couch with a glass of Pedialyte which he drank. (Exhibit 5, Laurie Bode deposition, page 35, lines 1-13). He had no further episodes of vomiting or diarrhea. (Exhibit 5, Laurie Bode deposition, page 59, lines 24-25; page 60, lines 1-7). At approximately 11:30 pm, the two of them went to sleep in the same bed. (Exhibit 5, Laurie Bode deposition, page 35, lines 19-25; page 36, lines 1-17). During the night, Makota woke Laurie a few times asking for more to drink which she provided. (Exhibit 5, Laurie Bode deposition, page 36, lines 18-25; page 37 lines 1-3).

At approximately 5:30 am, Laurie woke up and felt Makota. He seemed fine to her so she got up and got her husband off to work. (Exhibit 5, Laurie Bode deposition, page 37, lines 4-21). After he left for work, she went to the bathroom and then decided to wake up Makota. (Exhibit 5, Laurie Bode deposition, page 37, lines 21-23). She went

into the bedroom and tried to give him a drink but "he just fell over." (Exhibit 5, Laurie Bode deposition, page 7, lines 24-25). She could not get him to wake up so she called 9-1-1. (Exhibit 5, Laurie Bode deposition, page 8, lines 1-4). The paramedics soon arrived and began CPR in an effort to resuscitate Makota.

He was taken to Parkview Noble Hospital, arriving at 6:46 am. where resuscitative efforts continued but were unsuccessful. (Exhibit 7, Parkview Noble Hospital Record). They were stopped at 7:04 am. (Exhibit 7, Parkview Noble Hospital Record). The stool culture taken the previous evening at Parkview Whitely Hospital returned a positive finding for clostridium difficle at 10:45 am on December 27, 2005. (Exhibit 3, Affidavit Joachin Okafor, M.D.; Exhibit 6, Parkview Whitely Hospital Record). An autopsy later determined that Makota died from "dehydration due to vomiting and diarrhea due to clostridium difficle infection". (Exhibit 8, Certificate of Death).

Jeffery Brookes, MD is the Chief Physician/Quality Officer at Parkview Whitely Hospital. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 1). On December 26, 2005, the hospital had a policy in effect with respect to the hospital's compliance with EMTALA. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 2). Under the policy and medical staff bylaws, only physicians who are credentialed to perform Medical Screening Examinations are permitted to perform such examinations. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 3). As such, Emergency Department nurses and other staff are not permitted to perform Medical Screening Examinations. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 4).

As of December 26, 2005, both David Hurley MD and Joachin Okafor, MD were credentialed to perform Medical Screening Examinations in the Emergency Department at Parkview Whitely Hospital. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 5). It is within the medical judgment of the physician who performs the Medical Screening Examination to determine what history, examination and testing is needed in order to determine whether the patient has an Emergency Medical Condition (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 6). It is within the medical judgment of the physician who performs the Medical Screening Examination to determine whether the patient is in a stable condition and safe to be discharged from the hospital. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 7).

Dr. Brookes has reviewed the hospital chart for Makota Norris. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 8). From his review, it appears that Makota Norris received Medical Screening Examinations from both Dr. Hurley and Dr. Okafor. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 9). From his review, it further appears that the examination, testing, and consultation that was done by Dr. Hurley and Dr. Okafor was comparable to the examinations and testing offered to other patients at Parkview Whitely who present with similar symptoms. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 10). Further, it is his opinion that the examination and testing was designed to identify acute and severe symptoms that would ordinarily alert them of the need for immediate attention to prevent serious bodily injury or death. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 10).

Dr. Hurley and Dr. Okafor are of the opinion that they had sufficient information available to them in order to perform an appropriate medical screening examination. (Exhibit 2, Affidavit of David Hurley, MD, paragraph 9; Exhibit 3, Affidavit of Joachin Okafor, MD, paragraph 13). At no time did they order the nursing staff to take Makota's blood pressure, repeat vital signs at the time of discharge, nor did they order that Makota's intake and output be monitored. (Exhibit 6, Whitley Hospital Record) If either of them thought that any additional monitoring or testing needed to be done in order for them to perform appropriate medical screening examinations, they would have ordered it. (Exhibit 2, Affidavit of David Hurley, MD, paragraph 9; Exhibit 3, Affidavit of Joachin Okafor, MD, paragraph 13). Neither of them thought that Makota Norris was suffering from an emergency medical condition. (Exhibit 2, Affidavit of David Hurley, MD, paragraph 8; Exhibit 3, Affidavit of Joachin Okafor, MD, paragraph 10).

## II. The Hospital's Care of Makota Norris Complied with EMTALA.

EMTALA, located at 42 U.S.C. § 1395dd, reads, in pertinent part, as follows:

**Examination and treatment for emergency medical conditions . . .**

**(a) Medical screening requirement.** In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions. .**

(1) In general. If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) transfer of the individual to another medical facility in accordance with subsection (c).

EMTALA was enacted to address the problem of "patient dumping," *see Johnson v. University of Chicago Hosp.,* 982 F.2d 230, 233 n. 7 (7th Cir. 1993) where hospitals transferred indigent patients from one hospital to the next while their emergency medical conditions worsened. *See Harry v. Marchant,* 291 F.3d 767, 770 (11th Cir. 2002). EMTALA requires hospitals to screen every patient who comes to the hospital for an emergency medical condition. *Johnson,* 982 F.2d at 232-233. If the patient is diagnosed with an emergency medical condition, then the patient must be stabilized before he or she can be discharged or transferred to another facility. *Id.*

### A. An Appropriate Medical Screening Examination was Performed.

The undisputed facts lead to the conclusion that an appropriate screening examination was performed. It should be emphasized that EMTALA is not a federal malpractice statute. *Curry v. Advocate Bethany Hosp.,* 204 F. App'x 553, 556 (7th Cir. 2006). Treatment that is ineffective due to a misdiagnosis or even malpractice does not violate EMTALA. *Id.* State medical malpractice law provides the proper recourse for

allegations regarding inadequate medical care. *Estate of Haight v. Robertson,* 2008 U.S. Dist. LEXIS 30262 (N.D. Ind. Mar. 31, 2008)

While EMTALA does not define an "appropriate screening examination", the courts have achieved a consensus on a method of assessing the appropriateness of a screening exam:

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present with substantially similar complaints. . .
>
> [I]nstances of 'dumping' or improper screening of patients for discriminatory reason, or failure to screen at all, or screening a patient differently for other patients perceived to have the same condition, all are actionable under EMTALA. But instances of negligence in the screening or diagnostic process, or of mere faulty screening, are not. *Magruder v. Jasper Co. Hosp.,* 243 F. Supp. 886, 891 (N.D. Ind. 2003).

In other words, plaintiffs must show that the hospital provided only a cursory screening or treated the patient desperately. *Estate of Haight v. Robertson,* 2008 U.S. Dist. LEXIS 30262 (N.D. Ind. Mar. 31, 2008) This requires evidence that the patient received materially different screening than that provided to others in his condition. *Id.*

Jeffery Brookes, MD is the Chief Physician/Quality Officer at Parkview Whitely Hospital. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 1). On December 26, 2005, the hospital had a policy in effect with respect to the hospital's compliance with EMTALA. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 2). Under the policy and medical staff bylaws, only physicians who are credentialed to perform Medical Screening Examinations are permitted to perform such examinations. (Exhibit 1,

Affidavit of Jeffery Brookes, MD, paragraph 3). As such, Emergency Department nurses and other staff are not permitted to perform Medical Screening Examinations. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 4).

As of December 26, 2005, both David Hurley MD and Joachin Okafor, MD were credentialed to perform Medical Screening Examinations in the Emergency Department at Parkview Whitely Hospital. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 5). It is within the medical judgment of the physician who performs the Medical Screening Examination to determine what history, examination and testing is needed in order to determine whether the patient has an Emergency Medical Condition (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 6). It is within the medical judgment of the physician who performs the Medical Screening Examination to determine whether the patient is in a stable condition and safe to be discharged from the hospital. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 7).

Dr. Brookes has reviewed the hospital chart for Makota Norris. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 8). From his review, it appears that Makota Norris received Medical Screening Examinations from both Dr. Hurley and Dr. Okafor. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 9). From his review, it further appears that the examination, testing, and consultation that was done by Dr. Hurley and Dr. Okafor was comparable to the examinations and testing offered to other patients at Parkview Whitely who present with similar symptoms. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 10). Further, it is his opinion that the examination and testing was designed to identify acute and severe symptoms that would ordinarily alert them of

the need for immediate attention to prevent serious bodily injury or death. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 10). Since Makota Norris received more than a "cursory screening" and was not treated "disparately" from other patients with similar symptoms, no violation of EMTALA occurred.

It should be noted that, even when a hospital's screening examination departs from standard hospital policies, EMTALA is not violated if the departure is considered a *de minimus* deviation. *Magruder,* 243 F. Supp. at 892. Like the present case, the plaintiffs in *Magruder* filed both a proposed complaint for malpractice with the Indiana Department of Insurance and an EMTALA action in Federal Court. Similarly, the care involved a minor who was assessed by an Emergency Department nurse, had vital signs taken and recorded and then was examined by an Emergency Department physician. As in the present case, the Emergency Department physician made a diagnosis of a condition that was not considered to be an emergency medical condition, as defined by EMTALA, and discharged the patient with instructions to be seen by a treating physician the following morning.

In granting summary judgment in favor of the hospital, the District Court concluded that the screening examination performed by the Emergency Department physician "was appropriate and reasonably calculated" to identify an emergency medical condition. *Magruder,* 243 F.Supp.2d at 892. It reached this decision despite plaintiffs' arguments that the physician examined the patient for only five minutes, and that the hospital did not have a policy for assessing a patient's level of pain. *Magruder,* 243 F.Supp.2d at 892. The Court found it significant that the Emergency Department

13

physician examined the patient's groin, made his own assessment of the patient's pain and made a diagnosis that the patient was not suffering from an emergency medical condition. *Magruder,* 243 F.Supp.2d at 892.

Magruders argued that the hospital violated its own policy for screening children under two years of age due to the fact that the nurse never removed the diaper in order to weigh the patient. They argued that the nurses, therefore, could not have examined the groin area. In finding that this violation of hospital policy was *de minimus*, the court noted that the Emergency Department physician examined the groin and therefore, the failure of the nurse to examine the area "had no impact" on the screening exam by the Emergency Department physician. *Magruder,* 243 F.Supp.2d at 892-3.

Here, Makota Norris was assessed by the nursing staff, who also took Makota's vital signs and recorded them on the chart. Thereafter, he was examined by two Emergency Department physicians, Dr. Hurley and Dr. Okafor. Dr. Hurley ordered blood tests and a chest x-ray. Dr. Okafor interpreted the results of the x-ray and blood tests, ordered a culture of the bloody stool and discussed the history, examinations and results of the tests with Makota's pediatrician, Dr. Dick. Dr. Dick concurred with Dr. Okafor's diagnosis of acute gastroenteritis. Further, Dr. Dick suggested that Dr. Okafor discharge Makota with instructions that Makota be seen by him first thing in the morning. At best, plaintiffs allege a claim that Dr. Okafor failed to appreciate the seriousness of Makota's condition. While such a claim may sound in malpractice, there can be no question that it is not a violation of EMTALA.

Like the plaintiffs in *Magruder,* Bode and Norris will likely argue that Parkview Whitley Hospital violated its own policies by failing to take Makota's blood pressure, by failing to repeat vital signs at the time of discharge, and by failing to monitor or document Makota's intake or output while in the Emergency Department.

Parkview Whitley Hospital has a policy that blood pressures do not need to be routinely taken on children under six years of age. (Exhibit 1, Affidavit of Jeffery Brookes, MD, paragraph 11). While Makota was six years and three months of age, he could not talk, was in a diaper and weighed only 32 pounds. The nurse, Terri Eber, R.N., did not take his blood pressure because she thought he was less than six years old due to his appearance. (Exhibit 4, Terri Eber, RN deposition, page 62, lines 6-25; page 63, line 1).

As to the alleged failure to monitor intake and output, the only time that Makota vomited while in the Emergency Department, he did so into a towel that his mother had brought with her. (Exhibit 4, Terri Eber, R.N. deposition, page 31 lines 5-15). For this reason, Nurse Eber was unable to measure how much he had vomited. (4, Terri Eber, R.N. deposition, page 31 lines 5-15). Similarily, when he had his single episode of diarrhea in the Emergency Department, he did so into a diaper. (Exhibit 4, Terri Eber, R.N. deposition, page 25 lines 14-18). Therefore, it was *impossible* for the nursing staff to measure the amount of intake and output.

Most importantly, in order to perform an appropriate medical screening examination, neither Dr. Hurley nor Dr. Okafor considered it necessary that Makota's blood pressure be taken, that repeat vital signs be taken, or that the nurses monitor intake

and output. Both of them are of the opinion that they had sufficient information available to them in order to perform an appropriate medical screening examination. (Exhibit 2, Affidavit of David Hurley, MD, paragraph 9; Exhibit 3, Affidavit of Joachin Okafor, MD, paragraph 13). If either of them thought that any additional monitoring or testing needed to be done in order for them to perform appropriate medical screening examinations, they would have ordered it. (Exhibit 2, Affidavit of David Hurley, MD, paragraph 9; Exhibit 3, Affidavit of Joachin Okafor, MD, paragraph 13). None of these tests or monitoring were ordered by them, however. (Exhibit 6, Parkview Whitley Hospital Record). Because these alleged violations of hospital policy had "no impact on the medical screening exam", *Magruder,* 243 F.Supp.2d at 892, they were *de minimus.* Therefore, this Court should determine, as a matter of law, that an appropriate medical screening examination was performed.

**B. There Was No Duty to Stabilize or Transfer the Patient Because No Emergency Medical Condition was Diagnosed.**

As an alternative theory of liability, plaintiffs allege in paragraph 22 of the complaint that the Emergency Department physicians diagnosed Makota with an emergency medical condition and failed to stabilize him or transfer him to another medical facility. A hospital's duty to stabilize or transfer the patient does not arise, however, until the hospital first detects an emergency medical condition. *Magruder,* 243 F.Supp.2d at 894. This requires a showing of ***actual knowledge*** of an emergency medical condition by the hospital. *Id.*

EMTALA defines an "emergency medical condition" as follows:

**(1) The term "emergency medical condition" means--**

    (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--

    (i) placing the health of the individual . . . in serious jeopardy,
    (ii) serious impairment to bodily functions, or
    (iii) serious dysfunction of any bodily organ or part; . . .

42 U.S.C. § 1395dd (e)(1).

Both Dr. Hurley and Dr. Okafor performed medical screening examinations on Makota Norris (Exhibit 2, Affidavit of David Hurley, MD, paragraph 8; Exhibit3, Affidavit of Joachin Okafor, MD, paragraphs 6-8). Neither of them concluded that Makota Norris was suffering from an emergency medical condition, as defined by EMTALA. (Exhibit 2, Affidavit of David Hurley, MD, paragraph 8; Exhibit 3, Affidavit of Joachin Okafor, MD, paragraph 10). When Dr. Okafor discharged the patient, it was his opinion that the patient was in a stable condition. (Exhibit 3, Affidavit of Joachin Okafor, MD, paragraph 11). Since neither physician had "actual knowledge" of an emergency medical condition, no duty to stabilize or transfer the patient arose. Therefore, no violation of EMTALA occurred.

For all of the foregoing reasons, summary judgment should be entered in favor of defendants.

Respectfully submitted,

**ROTHBERG LOGAN & WARSCO LLP**

By: /s/ Mark W. Baeverstad
      Mark W. Baeverstad # 3896 –02
      110 West Berry Street, Suite 2100
      Fort Wayne, Indiana 46802
      Phone: 260/422-9454   Fax 260/422-1622
      Email: *mbaeverstad@rlwlawfirm.com*

## CERTIFICATE OF SERVICE

This will certify that on the 17th day of July, 2008, a true and complete copy of the above and foregoing was electronically served upon the following via the Court's ECF system:

Stephen R. Snyder
Jack C. Birch
Randall L. Morgan
Snyder, Birch & Morgan LLP
200 West Main Street
Syracuse, IN  46567

                /s/ Mark W. Baeverstad
                Mark W. Baeverstad