Terrie Eber **** 5/1/08

SHEET 9   PAGE 33

1 was administered to Makota.
2 A.   Correct.
3 Q.   Were you present at the time that it was being
4       administered?
5 A.   I -- no, I was not.
6 Q.   Do you recall any discussions with Dr. Okafor about the
7       decision to administer Rocephin to Makota?
8 A.   No.
9 Q.   Do you recall any discussions with the nurse that
10      administered the Rocephin about Makota?
11 A.  He informed me that he gave it, and that was all.
12 Q.  Do you recall a discussion with Dr. Okafor about the
13      decision to discharge Makota?
14 A.  He just told me that Dr. Dick told him to send him home
15      with the medications.  That's all I know.
16 Q.  So you recall Dr. Okafor referencing a conversation
17      that he had with Dr. Dick relating to discharge.
18 A.  Yeah.
19 Q.  Tell me about that conversation again, please.
20 A.  He just gives me the chart back and, and told me that
21      Dr. Dick wanted him to have the Rocephin and to be seen
22      in the office the next morning, and I typed the patient
23      out.
24 Q.  Is that the last communication you remember having that
25      night with Dr. Okafor concerning Makota?

PAGE 34

1 A.   Yes.
2 Q.   I'll hand you what's marked as Plaintiffs' Exhibit "5".
3       It's Emergency Department Aftercare Instructions.  Is
4       it a true and correct copy of the Aftercare
5       Instructions for Makota for December 26, 2005?
6 A.   Yes.
7 Q.   And up in the upper right-hand corner it indicates it's
8       printed at December 26, 2005 at nine twenty-two (9:22)
9       p.m.?
10 A.  Uh-huh (affirmative response).
11 Q.  Is it fair to say that by nine twenty-two (9:22) p.m.
12      the decision to discharge Makota had been made?
13 A.  Correct.
14 Q.  Are you the one that arranges for -- in this case, were
15      you the one that arranged for printing these Aftercare
16      Instructions out?
17 A.  Yes.
18 Q.  Are they printed, and they're printed off from a
19      computer?  Do you go to a computer and pull it up?
20 A.  Correct.
21 Q.  Can you walk me through the process?  Once Dr. Okafor
22      had given you the instruction that Makota was going to
23      be discharged, walk me through the process up to the
24      point where Makota and his mother were walking out the
25      door of the hospital.

PAGE 35

1 A.   I had typed up the discharge instructions.  Went in and
2       went over them with mom.  Asked her if she had any
3       questions.  Instructed her to come back if she had any
4       problems or if it proceeded to get worse.  And she took
5       him home.
6 Q.   Was he still in Exam Room 4?
7 A.   Yes.
8 Q.   Do you recall any statement to the effect of you being
9       uncomfortable with sending him home at that point?
10 A.  I don't recall.
11 Q.  Did you have any concerns about sending him home at
12      that point?
13 A.  The doctors make that decision.
14 Q.  I understand that.  Did you have any concerns about
15      sending him home at that point?
16 A.  The d....
17        MARK W. BAEVERSTAD, ESQUIRE:  Well, I guess I
18        would object to the question.  I think you're
19        asking her for a medical opinion, and she's not
20        qualified to do that.
21 Q.  Did you have any concern about sending him home at that
22      point?
23 A.  With the doctors discharging him, I'm assuming they
24      felt comfortable with it, so....
25 Q.  And I understand that.  I'm asking if you felt

PAGE 36

1 comfortable as a nurse.
2        N. JEAN SCHENDEL, ESQUIRE:  I'll just object as
3        it's been asked and answered.
4        MARK W. BAEVERSTAD, ESQUIRE:  And I'll repeat my
5        objection.  If you have anything you can -- if you
6        have anything else to say, but I think you've
7        already answered the question.
8 A.   Okay.  I don't.
9 Q.   So did you have any concern as a nurse about Makota
10      being discharged at nine thirty (9:30) p.m. on December
11      26, 2005?
12        N. JEAN SCHENDEL, ESQUIRE:  Same objections.
13        MARK W. BAEVERSTAD, ESQUIRE:  Same objections.
14 Q.  You can answer.
15 A.  I -- that is -- I mean, that is my answer.  I just --
16      they, h...he had been seen by two (2) doctors, and,
17      apparently, in my eyes, he was seen and treated and
18      released.
19 Q.  Let's, again, go through that process.  Did you hand
20      mother a bottle of any liquid?
21 A.  Pedialyte.
22 Q.  Okay.  Tell me about that.
23 A.  It's ordered on here, and she didn't have any, so I, I
24      gave them a bottle of Pedialyte to take home.
25 Q.  And what discussion did you have with her or she have

SHEET 10   PAGE 37

1   with you at that time?
2 A.   I don't recall.
3 Q.   After Makota was discharged on December 26, 2005, did
4      you have any discussion with any person at the hospital
5      concerning his evaluation or treatment?
6 A.   No.
7 Q.   I believe you testified earlier specifically that you
8      didn't have any discussion with Dr. Okafor after Makota
9      was discharged concerning Makota.
10 A.  No.  We probably did have the conversation, and I think
11     I'm the one that told him that he had....
12 Q.  No.  I mean on December 26, 2005.
13 A.  No, no.  I recall being very busy, is what I recall.
14 Q.  At the time of his discharge, it was busy?  What do you
15     recall about that?  How many patients do you recall...?
16 A.  Me being busy.
17 Q.  Do you recall how many patients you were taking care of
18     at that point?
19 A.  Not numbers exactly, no.
20 Q.  Was it more than five (5)?
21 A.  No.
22 Q.  Makota was pronounced dead at seven "0" four (7:04)
23     a.m. on December 27, 2005.  So less than ten (10) hours
24     after the reported discharge time.  Have you ever seen
25     the Death Certificate for him?

PAGE 38

1 A.   No, I have not.
2 Q.   Do you know what was reported as his cause of death?
3 A.   No, I do not.
4 Q.   And I want to make sure I understand.  Upon learning of
5      Makota's death, you don't recall a specific discussion
6      with Dr. Okafor as far as the contents of that
7      discussion?
8 A.   He was not there that day that I found out that, that I
9      recall.
10 Q.  But you recall simply notifying him of Makota's death?
11 A.  I asked him if he knew that the child had passed away.
12 Q.  Do you recall his response?
13 A.  He didn't know.
14 Q.  Do you recall anything else he said in response to that
15     news?
16 A.  No.  I don't believe we had an in-depth conversation.
17 Q.  Do you recall anything other than what you've just
18     indicated?
19 A.  No.
20 Q.  Do you recall any statement on December 26, 2005 by Dr.
21     Okafor relating to admitting Makota into the hospital?
22 A.  Uhm, I recall that he wanted to transfer the patient to
23     Dr. Dick's care.  That was why we paged.  Uhm, I don't
24     know what his discussion was, was with Dr. Dick, so I
25     don't know.

PAGE 39

1 Q.   But you know he discharged Makota from Parkview Whitley
2      Hospital...
3 A.   Yes.  Yes.
4 Q.   ...on December 26,...
5 A.   Yes.
6 Q.   ...2005?
7 A.   Yes.
8 Q.   Do you recall any statement by Dr. Okafor on December
9      26, 2005 relating to holding Makota longer for
10     observation?
11 A.  No.
12 Q.  Are you aware of any policy that Parkview Whitley
13     Hospital has providing for hold times for observation?
14     Twenty-three (23) holds.
15 A.  With a physician's admis...it had to have a physician
16     to admit.
17 Q.  And that's a policy that Parkview Whitley Hospital had
18     as of December 26, 2005?
19 A.  Yes.
20 Q.  And regarding that policy on that date, do you recall
21     Dr. Okafor referencing, making any statement relating
22     to holding Makota over for observation?
23 A.  Not to me.
24     MARK W. BAEVERSTAD, ESQUIRE:  And I would further
25     object.  I think, as she testified, you would have

PAGE 40

1      to have a physician to admit the patient, and Dr.
2      Okafor wouldn't have the authority to admit the
3      patient; Dr. Dick would.
4 Q.   Do you recall any statement on December 26, 2005 by any
5      person relating to admitting Makota at the hospital on
6      that night?
7 A.   No.
8 Q.   Do you recall any statement by any person relating to
9      holding Makota longer for observation on that night?
10 A.  No.
11 Q.  Let's, if we could, go back to Plaintiffs' Exhibit "2",
12     and I'd like to start at the top of this and have you,
13     to the extent it's your note or to the extent it's
14     legible to you, go through this and tell me what you
15     interpret these various statements to be.  At the top,
16     it says, dated December 26, 2005?
17 A.  Uh-huh (affirmative response).
18 Q.  And is that your handwriting there?
19 A.  No.
20     The room time is "1810".  Would you have written that?
21 A.  No.
22 Q.  Do you know who wrote that?
23 A.  The paramedic that was with me when we brought him
24     back.
25 Q.  Okay.  And looking at Nursing Assessment, other than

SHEET 11  PAGE 41

1  what we talked about before where I believe it was the
2  EMT had written that, and then you signed off after it,
3  are all of the other entries within the box, is that
4  your handwriting?
5  A.  Yes.
6  Q.  Could you go through that and read those for me,
7  beginning with eighteen forty-five (1845)?
8  A.  "1845 nurse in with lab attempting to draw blood.
9  Patient is very difficult to get blood from.  At 1915
10  patient resting on the cart.  Attempting to draw blood
11  for blood cultures.  Patient's mother at bedside.  At
12  1945 no vomiting.  Patient resting on the cart.  No
13  diarrhea.  Patient was up for reevaluation.  At 2100
14  patient sipping water at this time.  No change in
15  patient's condition.  Patient is more awake at this
16  time."
17  Q.  And then you circled I assume that -- did you circle
18  "See notes"?
19  A.  Right.
20  Q.  Is that referencing the Nursing Flow Sheet?
21  A.  Yes.
22  Q.  Let's go to that, and that's Exhibit "4".  And just for
23  the record, make sure everybody's on the same page as
24  to what these entries say, if you could read those
25  entries for us as well, please.

PAGE 42

1  A.  "At 2030 patient had a large loose bloody diarrhea.
2  Patient's mother is very alarmed.  Dr. Okafor in
3  talking with her.  Stool sent to lab.  At 2100 waiting
4  for Dr. Dick to return page.  Patient is resting on the
5  cart.  Lethargic.  Vomited x 1.  Small amount of brown
6  emesis.  Dr. Okafor notified.  Unable to collect any
7  emesis because the patient vomited into a towel.
8  Patient's mother at bedside.  At 2130 explained
9  discharge instructions to the patient's mother.
10  Patient is still lethargic.  No further vomiting or
11  bloody diarrhea."
12  Q.  Thank you.  And if you go to Exhibit "3", if you could
13  read those entries as well for me, please?
14  A.  "At 1853, Zofran, 1 mg PO.  At 2110, Rocephin, 750 mg
15  IM, 6, and Ron Putnam, or R. Putnam Rn."
16  Q.  At the bottom of Exhibit "3", it says "INTAKE," and
17  then "OUTPUT."  Do you see that?
18  A.  Uh-huh (affirmative response).
19  Q.  What are those for?
20  A.  When you are able to measure or when you, they voided
21  something or, or vomited something you can measure, you
22  can write it down there.
23  Q.  And under "INTAKE," if they're drinking something or if
24  they have an IV,...
25  A.  Uh-huh (affirmative response).

PAGE 43

1  Q.  ...you can monitor that?
2  A.  Correct.
3  Q.  That wasn't filled out in this case.  Do you know why?
4  A.  He didn't sip very much.
5  Q.  He didn't sip very much?
6  A.  No.  He was....
7  Q.  Do you know whether -- I'm sorry.  Go ahead.
8  A.  I didn't have anything that was in a measurable state.
9  A cup that was measurable or anything that....
10  Q.  Have you filled these out before with some other
11  patient?
12  A.  Yes.
13  Q.  Is there any reason why the liquids he was drinking
14  couldn't have been measured?
15  A.  They could have been if -- I just didn't think he drank
16  enough.  He was only taking sips.
17  Q.  Do you recall how many times Makota vomited after your
18  contact with him in the hospital on December 26, 2005?
19  A.  I'm only aware of one (1) time.
20  Q.  Did you provide mom any type of, anything to catch any
21  vomit if he was to vomit?
22  A.  I don't recall.  We usually have emesis basins in the
23  room.
24  Q.  Do you remember there being an emesis basin in the
25  room?

PAGE 44

1  A.  There are emesis basins in every room.  I don't recall
2  whether I handed it to her or not.
3  Q.  Do you recall discussing with mom any aspect of
4  monitoring how much urine output was coming from
5  Makota?
6  A.  No.
7  Q.  Do you recall any statement by Dr. Okafor on December
8  26, 2005 relating to the use of an IV for Makota?
9  A.  No.
10  Q.  Did you ever raise any issue or make any statement
11  concerning the use of an IV for Makota?
12  A.  Not that I recall.
13  Q.  Do you recall any other person at the hospital on
14  December 26, 2005 making any statement as to the use of
15  an IV for Makota?
16  A.  Not that I recall.
17  Q.  Is it possible that discussion could have taken place;
18  you just don't recall it?
19  A.  Not to my knowledge.
20  Q.  Is there any policy that you're aware of or protocol
21  that you're aware of at Parkview Whitley Hospital where
22  the intake or output form at the bottom of Plaintiffs'
23  Exhibit "3" is required to be filled out?
24  A.  I'm not aware of it if it is.
25  Q.  Are you aware of the intake/output portion of this

Terrie Eber *** 5/1/08

SHEET 12   PAGE 45

1  Exhibit "3" being completed for other patients, with
2  those patients being children?
3 A.  I've done it in the past.
4 Q.  Do you recall specifically like the age of the patient?
5 A.  No, I don't recall specifically.
6 Q.  Do you recall if that patient would have been under ten
7  (10) years old?
8 A.  Yeah.
9 Q.  Do you recall if that patient was under five (5) years
10  old?
11 A.  No, I don't recall that young.
12 Q.  Do you recall taking Makota's blood pressure on
13  December 26, 2005?
14 A.  No.
15 Q.  Do you know why?
16 A.  Uhm, no, I don't.
17 Q.  If you could take a look at Exhibits "2", "3" and "4"
18  and as to any entries that you made which we've talked
19  about, can you tell me if that information appears
20  accurate to you?
21 A.  Yes.
22 Q.  As you look at Exhibits "2", "3" and "4", do you see --
23  are you aware of any action you took with respect to
24  Makota that is not documented on these three (3)
25  documents?

PAGE 46

1 A.  I'm always in and out of the rooms checking on my
2  patients, and I recall being in the room with him many
3  of times.
4 Q.  So is there something missing on here that...?
5 A.  Not that I can remember.  I provided comfort for mom
6  and the child and the, just checking in on him.
7 Q.  And when you would do that, you would document checking
8  in on them?
9 A.  Not every time, because sometimes I can go in there and
10  then go to another room immediately after and not....
11 Q.  On Exhibit "2", we talked briefly about this before, on
12  the upper right-hand corner where you have the weight
13  listed,...
14 A.  Uh-huh (affirmative response).
15 Q.  ...are those your entries?
16 A.  No.
17 Q.  Do you know who made those entries?
18 A.  The paramedic.
19 Q.  So the "1812" is the paramedic's?
20 A.  Yes.
21 Q.  The "98%" memure saturation, that's paramedic's?
22 A.  Yes.
23 Q.  Pulse, "102," that's the paramedic?
24 A.  Yes.
25 Q.  All of those entries, the "22," the "97.5," those were

PAGE 47

1  all made by the paramedic?
2 A.  Yes.
3 Q.  Did the paramedic take those vital signs?
4 A.  Yes.
5 Q.  Did you take any vital signs of Makota?
6 A.  No.
7 Q.  And these are the vital signs that were taken of Makota
8  on December 26, 2005?
9 A.  Correct.
10 Q.  Going back to Makota's discharge, if you look at
11  Exhibit "4", your last nursing note, and you've read it
12  as part of the note as "Patient is still lethargic."
13  Zero further vomiting or bloody diarrhea.  But you're
14  indicating that he's still lethargic.
15 A.  Correct.
16 Q.  Describe for me what you're observing at the last
17  encounter you had with Makota on December 26, 2005.
18 A.  He still looked like an ill child.  He was listless.
19  He was a...awake.  He was arousable, but he just looked
20  like a sick child.
21 Q.  And was Makota's mom holding him at that point?
22 A.  Yes.
23 Q.  Did you give her that bottle of, you say, is Pedialyte?
24 A.  Uh-huh (affirmative response).
25 Q.  And so she's holding Makota.  You're handing her a

PAGE 48

1  bottle of Pedialyte.
2 A.  I believe he was still laying on the cart when I gave
3  her the Pedialyte.
4 Q.  Do you remember her picking him up?
5 A.  I was in the room.  I didn't watch her pick him up, no.
6 Q.  Is that your last encounter with him, and did you see
7  them out the door?  Did you watch them walk out?
8 A.  I watched them walk out the door, yes.
9 Q.  Do you remember whether it was just Makota and his mom?
10 A.  I think I remember someone else being there, but I'm
11  not positive of that.
12 Q.  So, nine thirty (9:30) p.m., "Patient is still
13  lethargic" is being reported.  Mom is carrying Makota
14  out of the hospital.  At eight thirty (8:30) p.m. has a
15  large loose bloody diarrhea, correct?
16 A.  Uh-huh (affirmative response).
17 Q.  At nine (9:00) p.m. there was some vomiting, correct?
18 A.  Yes.
19 Q.  Based on that, would you characterize Makota as looking
20  well at that point?
21 A.  He looked like an ill child to me when he was
22  discharged.
23 Q.  On December 26, 2005, do you recall any statements by
24  Dr. Okafor regarding pseudomembranous colitis?
25 A.  No.

Terrie Eber *** 5/1/08

SHEET 13   PAGE 49

1 Q.  On December 26, 2005, do you recall any statements made
2      by Dr. Okafor to anyone regarding colitis?
3 A.   No.
4 Q.   Are you aware of any consideration Dr. Okafor had made
5      to pseudomembranous colitis with respect to Makota?
6 A.   No.
7 Q.   On December 26, 2005, are you aware of any statements
8      by Dr. Okafor regarding Makota's dehydration status?
9 A.   No.
10 Q.  On December 26, 2005, are you aware of any statement by
11     Dr. Okafor regarding Makota's degree of dehydration?
12 A.  No.
13 Q.  Did you ever observe Dr. Okafor assessing Makota's
14     dehydration status?
15         N. JEAN SCHENDEL, ESQUIRE:  I guess I'm going to
16         object, because I think that's a really big
17         question.  I'm not sure what you mean.
18 Q.  Are you aware...?
19 A.  I'm not sure what you mean.
20 Q.  Okay.  Are you aware of anything that Dr. Okafor did
21     that would relate to determining whether Makota was
22     dehydrated?
23 A.  He went into the room and assessed the patient.  I was
24     not present in the room.  Uhm, he did the lab tests,
25     but I did not, no one explained those to me.

PAGE 50

1 Q.  So you didn't observe any physical examination that Dr.
2      Okafor did to Makota.
3 A.   Except when he had the bloody diarrhea and he was
4      palpating his abdomen and listening.
5 Q.   Are you required to take any type of continuing medical
6      education in connection with your nursing license?
7 A.   Yeah.  We take advanced, uh, ACLS Powell.  Those type
8      of classes.
9 Q.   Have you -- is that a requirement for your license, or
10     is that a requirement of Parkview?
11 A.  Requirement of Parkview.
12 Q.  Have you ever had any type of continuing medical
13     education course work that relates to dehydration
14     assessment?
15 A.  No.
16 Q.  What about dehydration treatment?
17 A.  Not to my knowledge, unless it's included in Powell,
18     and it might be a little bit.
19 Q.  Do you know what dehydration is?
20 A.  Uh-huh (affirmative response).
21 Q.  What is it?
22 A.  Well, there is not enough fluids there in the, i...in
23     the space to provide the body.
24 Q.  Are you aware of signs or symptoms of dehydration?
25 A.  Yeah.

PAGE 51

1 Q.  What are you aware of with that?
2 A.  Dry mucous membranes, tenting skin.  Things like that.
3 Q.  Did you do any type of physical examination of Makota
4      on December 26, 2005?
5 A.  Yes.  I listened to his breath sounds, his abdomen.  I
6      looked at him.
7 Q.  Did you do -- did you check his skin turgor?
8 A.  Yes.  When I was looking at him originally.
9 Q.  Tell me about that.  What did you do?
10 A.  I didn't have a lot of tenting or anything.
11 Q.  Are you aware of anybody else that checked his skin
12     turgor?
13 A.  No.
14 Q.  Are you aware of the different degrees of dehydration?
15 A.  Not specifically, no.
16 Q.  Mild, moderate or severe?
17 A.  No.
18 Q.  As an employee of Parkview Whitley Hospital, are you
19     aware of any obligation you have to abide by the Code
20     of Ethics of the American Nurses Association?
21 A.  Yes.
22 Q.  Do you have an obligation to abide by the Code of
23     Ethics of the American Nurses Association?
24 A.  Oh, I don't know that, that is set in stone or a...I
25     don't know if that's part of the policy or not, no.

PAGE 52

1 Q.  Do you know whether, since you're not a member of the
2      American Nurses Association, do you know whether, as a
3      requirement with Parkview Whitley Hospital, are you
4      required to abide by the scope and standards of
5      practice of the American Nurses Association?
6 A.  I believe so.
7 Q.  You believe you are required to abide by the scope and
8      standards of practice of the American Nurses
9      Association?
10 A.  I believe so.
11 Q.  On December 26, 2005, do you recall Dr. Okafor making
12     any statement relating to having any form of urine
13     gravity test for Makota in connection with the
14     dehydration assessment?
15 A.  I don't recall.
16 Q.  And it's not in the records, right?
17 A.  Right.
18 Q.  Are you aware of whether or not lethargy is a sign of
19     dehydration?
20 A.  Oh, I'm su...yes, it is.
21         RANDALL L. MORGAN, ESQUIRE:  Why don't we go off
22         record?
23 OFF RECORD
24 ON RECORD
25 Q.  Ms. Eber, just briefly, are you aware of the policy

**PETRO REPORTING SERVICE, INC.**
**www.petroreporting.com**
**260-422-4404**

SHEET 14   PAGE 53

1   that Parkview Whitley Hospital used to have regarding a
2   standard of care for diarrhea?
3 A.   No, I'm not.
4 Q.   Are you aware of a policy that Parkview Whitley
5   Hospital regarding a standard of care for vomiting?
6 A.   I'm sure it's there, but I've never looked at it.
7 Q.   Are there policies or protocols that you're expected to
8   abide by that are made available for you to review if
9   you want at Parkview Whitley Hospital?
10 A.   Yes.
11 Q.   Where are those located at?
12 A.   On the computer.
13 Q.   All of them are on the computer?
14 A.   Now.  I'm not sure if they were then.
15 Q.   Okay.  On December 26, 2005, do you know where they
16   were at?
17 A.   Uhm, either in a book or on the computer.  I don't
18   remember that.
19 Q.   Have you ever seen a book, some type of bound volume,
20   that contains policies?
21 A.   Right.
22 Q.   You have?
23 A.   I have.
24 Q.   Is there any point when you were first employed by
25   Parkview that you were required to study the policies

PAGE 54

1   or protocols?
2 A.   You reviewed them.
3       RANDALL L. MORGAN, ESQUIRE:  I have no further
4       questions.
5                    CROSS-EXAMINATION
6 BY: N. JEAN SCHENDEL, ESQUIRE
7 Q.   May I call you Terrie?
8 A.   Yes, please.
9 Q.   Terrie, my name is Jean Schendel.  I represent Dr.
10   Okafor, Dr. Hurley and PEP or whatever it's called.
11       MARK W. BAEVERSTAD, ESQUIRE:  Professional
12       Emergency Physicians.
13 Q.   Professional Emergency Physicians.
14       N. JEAN SCHENDEL, ESQUIRE:  Thank you.
15   I have a few follow-up questions here, and I want to
16   maybe work backwards.  You were asked whether lethargy
17   is a sign of dehydration.  Do you remember that
18   question?
19 A.   Yes.
20 Q.   Is lethargy a sign of other conditions?
21 A.   Absolutely.
22 Q.   Would you characterize that as a vague or non-specific
23   presentation?
24 A.   Yes.
25 Q.   Dr. Hurley has dictated a note....

PAGE 55

1       N. JEAN SCHENDEL, ESQUIRE:  Tim, do you want me to
2       talk louder?
3       COURT REPORTER:  No.  You're fine.  I just turned
4       it the other way.
5 Q.   Dr. Hurley has dictated a note concerning his history
6   and physical of the child, and he described him as a
7   thin male child.  Would you agree with that
8   characterization?
9 A.   Yes.
10 Q.   He also dictated that the child was very ill-kempt.  Do
11   you recall making an observation that would be
12   consistent with Dr. Hurley's observation?
13 A.   Yes.
14 Q.   Tell me what you saw.
15 A.   Uhm, he was u...unclean.
16 Q.   We have taken Ms. Bode's deposition earlier today, and
17   she has testified that the child vomited on the way
18   from home as he was traveling to the emergency
19   department, and she changed his clothing.  Do you
20   recall knowing about that or observing any change in
21   clothing?
22 A.   No.
23 Q.   She also had testified that the child vomited into a
24   towel on the way from the home and to the hospital.
25   Were you made aware of that information?

PAGE 56

1 A.   No.
2 Q.   Are you aware of any vomiting episodes that Makota had,
3   other than that which you have documents at twenty-one
4   hundred (2100) while he was in the emergency
5   department?
6 A.   No.
7 Q.   Did you observe the towel that Makota had vomited into?
8 A.   The one that -- when he vomited in the hospital, yes.
9 Q.   Can you describe for me what you saw when you observed
10   the towel?
11 A.   That it was a dark-colored liquid that was soaked into
12   the towel.  It wasn't a, a lot that I could tell, but I
13   was, came in after it had happened, so....
14 Q.   Was it a large towel?
15 A.   Yeah.  Like a bath towel.
16 Q.   Was the towel generally dry or was it wet, or how would
17   you describe it?
18 A.   It was not ours, so I didn't pick it up or -- it was
19   brought in with the....
20 Q.   Just wouldn't know one way or the other?
21 A.   Right.
22 Q.   Dr. Hurley has also described there were abrasions
23   about Makota's anterior face.  Did you make any
24   observations of abrasions that you recall?
25 A.   Huh-uh (negative response).  I don't recall.

Terrie Eber  ***  5/1/08

SHEET 15   PAGE 57

1 Q.   Did you assess the mucous membranes when you were
2      looking at Makota or caring for him during the
3      emergency department visit?
4 A.   Yes.
5 Q.   Dr. Hurley has described the oral mucosa shows good
6      moisture content with no lesions or erythema noted.
7      Would you agree with his description?
8 A.   Yes.
9 Q.   He also had dictated the lids and conjunctiva are
10     normal bilaterally.  Would you agree with that
11     assessment, or did you make an assessment?
12 A.  I didn't make an assessment.
13 Q.  You were asked about taking repeat vital signs on
14     Makota.  Do you remember that question by Mr. Morgan?
15 A.  Yes.
16 Q.  If you had felt this child was other than stable, would
17     you have repeated the vital signs?
18 A.  Yes.
19 Q.  You testified that you did check Makota's skin turgor.
20 A.  Right.
21 Q.  And I didn't hear your response.  Could you tell me
22     what you found?
23 A.  I didn't ha...there was no major tenting of the skin or
24     anything.
25 Q.  Did you do any other examination or assessments to

PAGE 58

1      check his dehydration status or hydration status?
2 A.   He was actually drooling at one point, so I didn't go
3      any further as....
4 Q.   Other than the....
5           MARK W. BAEVERSTAD, ESQUIRE:  I'm sorry.  He was
6      drooling?
7 A.   He had slobber coming out of his mouth.
8           MARK W. BAEVERSTAD, ESQUIRE:  Okay.  Thank you.
9 A.   I would say drooling.  Sorry.
10 Q.  Other than the diarrhea that is noted at twenty thirty
11     (2030), that was the large loose bloody diarrhea, are
12     you aware of any other diarrhea episodes while he was
13     in the emergency department that evening?
14 A.  No, I am not.
15 Q.  Did Ms. Bode report to you the amount of emesis or
16     diarrhea that Makota had experienced before he
17     presented to the emergency department?
18 A.  No.
19 Q.  Do you know if he voided while he was in the emergency
20     department?
21 A.  He had a diaper on and I couldn't tell between the
22     diarrhea and the, uh, they're pretty absorbent.
23 Q.  Did the mom report whether Makota had voided while he
24     was in the E.D.?
25 A.  No.

PAGE 59

1 Q.   Do you know whether she changed his diaper while he was
2      in the E.D.?
3 A.   Just the one that I'm aware of.
4 Q.   And that was with the large bloody stool?
5 A.   Correct.
6 Q.   Okay.
7           N. JEAN SCHENDEL, ESQUIRE:  I don't have any
8      further questions.
9 Q.   Thank you.
10 A.  Thank you.
11          MARK W. BAEVERSTAD, ESQUIRE:  I just have a few
12     follow-up questions.
13              CROSS-EXAMINATION
14 BY:  MARK W. BAEVERSTAD, ESQUIRE
15 Q.   You were asked about who you recall being in the room.
16     We took some -- we asked Ms. Bode some questions this
17     morning about who was there, and she recalls her
18     teenage son being in the room at the same time.  Now
19     that I say that, do you remember a teenage boy being in
20     there or not?
21 A.   I remember someone, or I think I remember someone being
22     there, but he was not in the room the whole time, I
23     know that.  He was not in the room when I brought the
24     child back.  I know that.
25 Q.   He was not there at that point in time?

PAGE 60

1 A.   No.
2 Q.   Okay.
3 A.   If he....
4 Q.   Go ahead.
5 A.   If he came in, in between, I, I mean, and I may not
6      have seen that, though, because I may have been with
7      another patient.
8 Q.   You were asked, I think, about most of the entries on
9      the emergency department record.  But a part of the
10     Nursing Assessment, there's some boxes at the top that
11     you weren't asked about, and I'd like to just cover
12     those briefly.  Where it says "Time: 1812," is that the
13     time that you did your nursing assessment?
14 A.  Yes.
15 Q.  And then underneath that, it says, "Neuro" and there's
16     some initials there.  Did you do a neurological
17     assessment of the patient?
18 A.  No.  That just means he was alert and oriented for
19     his....
20 Q.  Okay.  So you did assess his level of alertness at that
21     point, correct?
22 A.  Yeah.
23 Q.  And where it says "GCS," what is that?
24 A.  Glasgow Coma Scale.
25 Q.  And is that Glasgow Coma Scale, is that a tool that is

**PETRO REPORTING SERVICE, INC.**
**www.petroreporting.com**
**260-422-4404**

SHEET 16   PAGE 61

```
 1   used to assess a patient's neurological status?
 2 A. Yes.
 3 Q. And is fifteen (15) the highest score that you can get?
 4 A. Yes.
 5 Q. And that would be the best score?
 6 A. Yes.
 7 Q. And then it says, "Skin." Is that where you noted your
 8   assessment of the skin?
 9 A. Yes.
10 Q. And what did you write?
11 A. I didn't write that. That's....
12 Q. Oh, that's the....
13 A. That's the paramedic's.
14 Q. Paramedic. And what was written there?
15 A. It looks like "PWD."
16 Q. Which stands for what?
17 A. Pink, warm and dry.
18 Q. If you had noted any problems with skin turgor, would
19   you have noted that in the chart?
20 A. Yes.
21 Q. And where would you have noted that?
22 A. In my, my nurse's notes.
23 Q. The one (1) time that he vomited in the emergency
24   department is when he vomited into this towel that mom
25   had brought from home?
```

PAGE 62

```
 1 A. Correct.
 2 Q. Would there have been any way for you to measure the
 3   volume of emesis based on the fact that he vomited into
 4   this towel?
 5 A. No.
 6 Q. You were asked about blood pressure, and a blood
 7   pressure wasn't taken. Is there a policy at Parkview
 8   Whitley Hospital with respect to taking blood pressures
 9   of children five (5) and under?
10 A. We don't take blood pressures on children five (5) and
11   under, except in emergency situations.
12 Q. And in this particular situation, you have a child that
13   weighs approximately thirty pounds (30 lbs.) and is in
14   a diaper. Would there be an explanation as to why blood
15   pressure was not done in this particular case, the
16   belief...
17       RANDALL L. MORGAN, ESQUIRE: Objection. Leading.
18       MARK W. BAEVERSTAD, ESQUIRE: Let me finish the
19   question.
20       RANDALL L. MORGAN, ESQUIRE: Sorry.
21 Q. ...a belief that this child was five (5) and under,
22   and, therefore, the policy did not require blood
23   pressure?
24       RANDALL L. MORGAN, ESQUIRE: Objection. Leading.
25 Q. You can go ahead and answer.
```

PAGE 63

```
 1 A. Yes.
 2       MARK W. BAEVERSTAD, ESQUIRE: That's all I have.
 3 Q. Thank you.
 4             REDIRECT EXAMINATION
 5 BY: RANDALL L. MORGAN, ESQUIRE
 6 Q. Ms. Eber, briefly, you've indicated that you checked
 7   Makota's skin. You did a skin turgor test as part of
 8   your initial assessment?
 9 A. Yes.
10 Q. And the results of that are reflected on Exhibit "2" in
11   the box labeled "Skin"?
12 A. Yeah, but I did not write that. It was -- I....
13 Q. So did you direct the EMT to write that?
14 A. I, I just -- no, I didn't say it out loud.
15 Q. But you did a skin turgor test on Makota as part of the
16   initial assessment, correct?
17 A. I do on every child.
18 Q. And that's the only skin turgor test that you did on
19   Makota on December 26, 2005.
20 A. Correct.
21       RANDALL L. MORGAN, ESQUIRE: No further questions.
22       N. JEAN SCHENDEL, ESQUIRE: Nothing further.
23       MARK W. BAEVERSTAD, ESQUIRE: Nothing further.
24             FURTHER DEPONENT SAITH NAUGHT
25 OFF RECORD  1:48 p.m.
```

RE: DEPOSITION OF TERRIE L. EBER

## ERRATA SHEET
As you read your deposition, if you have any corrections
to make, please itemize them below.  Upon completion please
date and sign your name on the signature line.  This will
become a part of your deposition for filing.

CORRECTIONS TO DEPOSITION

PAGE/LINE            SHOULD BE:                    REASON FOR CHANGE:

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____    _____    _____


DATE:_____   SIGNATURE:_____
                                   TERRIE L. EBER