# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

LAURIE A. BODE, and   )
MICHAEL D. NORRIS,    )
individually and as    )
parents and guardians of )
MAKOTA Z. NORRIS, a    )
deceased minor,     )
             )
Plaintiffs,      )
             )
vs.          )  NO. 1:07-CV-324
             )
PARKVIEW HEALTH SYSTEM,  )
INC. and WHITLEY MEMORIAL )
HOSPITAL, INC. d/b/a   )
PARKVIEW WHITLEY HOSPITAL, )
             )
Defendants.      )

## OPINION AND ORDER

This matter is before the Court on the: (1) Motion for Summary Judgment, filed by Defendants Parkview Memorial Hospital, Inc., and Whitley Memorial Hospital Inc., d/b/a Parkview Whitley Hospital, on July 17, 2008; and (2) Motion to Strike, filed by Defendants on October 1, 2008. For the reasons set forth below, the motion to strike is **DENIED.** The motion for summary judgment is **GRANTED in part and DENIED in part.** To the extent the motion seeks summary judgment on Plaintiff's claim that Defendants failed to perform an appropriate medical screening under EMTALA, the motion is **DENIED.** To the extent the motion seeks summary judgment on Plaintiff's

claim that Defendants failed to stabilize under EMTALA, the motion is **GRANTED.**

BACKGROUND

Laurie Bode and Michael Norris (collectively "Plaintiffs"), individually and as parents and guardians of Makota Z. Norris, a deceased minor, brought suit against Defendants, Parkview Memorial Hospital and Whitley Memorial Hospital, Inc., d/b/a Parkview Whitley Hospital (collectively "Parkview" or "Defendants"), for the wrongful death of their son, Makota Norris ("Makota"). Plaintiffs allege that Defendants did perform an appropriate medical screening, as required under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, when Makota presented at Parkview's Emergency Department on December 26, 2005. Alternatively, Plaintiffs allege that if Defendants determined that Makota had an emergency medical condition, Defendants failed to stabilize Makota before being discharged, also in violation of EMTALA. Defendants filed the motion for summary judgment claiming there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Defendants filed the motion to strike, seeking to strike an article titled, "Managing Acute Gastroenteritis Among Children," referred to as exhibit 20 in the deposition of Jeffrey Brookes, M.D. These motions will be addressed in turn.

<u>DISCUSSION</u>

<u>Motion to Strike</u>

Defendants filed a motion to strike Exhibit 20 to the deposition of Jeffrey Brookes, M.D., entitled "Managing Acute Gastroenteritis Among Children," arguing that the article is not admissible under Rule 803(18) of the Federal Rules of Evidence.

Rule 803(18) is the "Learned treatises" exception to the hearsay rule.  It provides that:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject . . . medicine . . . established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice.  If admitted, the statements may be read into evidence but may not be received as exhibits.

Fed. R. Evid. 803(18)

Based on this rule, Defendants argue that, to the extent portions of this treatise were brought to Dr. Brookes' attention, they may be read into the record, but the treatise itself is not permitted into evidence as an exhibit.  Moreover, Defendants assert that because Dr. Brookes was never questioned about any of the statements contained within that article, none of those statements fall within the ambit of Rule 803(18).

Rule 803(18) aside, Plaintiffs point out that the article in question is a report from the Center for Disease Control ("CDC"), and argue that the article is therefore admissible as a public

report pursuant to Rule 803(8). Rule 803(8), the public records and reports exception to the hearsay rule, states that the following documents are not excluded by the hearsay rule:

> [r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

The CDC report is seemingly admissible under Rule 803(8). *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292 (4th Cir. 1984). Indeed, Dr. Brookes stated that CDC documentation is usually a credible and authoritative source. (Brookes Dep. pp. 35-37). As Defendants have failed to file a reply brief to counter Plaintiffs' argument, or demonstrate why the CDC report somehow lacks trustworthiness or is otherwise inadmissible, the Court denies Defendants' motion to strike and will consider the article for purposes of reviewing the summary judgment motion.


Motion for Summary Judgment

Defendants argue that there is no genuine issue of material fact and, as a matter of law they did not violate either of the provisions of EMTALA in providing Emergency Department services to Makota Norris. In response, Plaintiffs argue that material facts exist as to whether Defendants violated their duties under EMTALA to provide Makota with an "appropriate medical screening." Alternatively, Plaintiffs argue that if Defendants determined that

-4-

Makota had an emergency medical condition, there exists a genuine issue of material fact as to whether Defendants failed to stabilize Makota before discharging him.

Facts

Makota Z. Norris ("Makota") was born on September 29, 1999. (Bode Dep. p. 5). Makota had multiple health and developmental problems, including that he was born with a heart defect and deaf. (Bode Dep. pp. 6-7). As he developed, he had trouble gaining weight and had numerous respiratory and sinus infections that brought him to the hospital. (Bode Dep. p. 7). Makota also had severe developmental delay. By the age of six (6), he did not talk; he used a walker to walk; he needed help showering, dressing and eating and was still wearing diapers. (Bode Dep. pp. 13, 15, 17).

In the afternoon of December 26, 2005, Makota started vomiting and had diarrhea. (Bode Dep. p. 10). His mother, Laurie Bode ("Bode"), was worried because he was "going out of both ends" and she took him to Parkview Whitley Hospital to be evaluated. (Bode Dep. pp. 10, 19). Bode and Makota arrived at the Emergency Department at Parkview at approximately 6:10 P.M. (Pl. Ex. 6). Upon arrival, Makota and Bode were taken into a room where Nurse Terrie Eber ("Eber"), along with a paramedic, started to take the history and information about Makota from Bode. (Eber Dep. p. 19).

The paramedic noted that "Patient's mother states patient has had diarrhea and vomiting since 4:30 p.m. this afternoon. Patient's mother gave antiemetic suppository prior to arrival." (Eber Dep. p. 19, Pl. Ex. 6). The paramedic took Makota's vital signs, which showed a pulse of 102, respiration of 22 and a temperature of 97.5 (Eber Dep. pp. 46-47; Pl. Ex. 6, Parkview Whitley Hospital Record). Furthermore, Makota was weighed and found to weigh 32.1 pounds. (Pl. Ex. 6).

Nurse Eber found Makota to be alert and oriented, but seemed lethargic and looked ill. (Eber Dep. pp. 11, 60; Pl. Ex. 6). Makota's neurological level was then assessed using the Glascow Coma Scale; Nurse Eber found him to have a score of 15 out of 15, which is the best score available. (Eber Dep. pp. 60-61; Pl. Ex. 6). Finally, she assessed Makota's skin to be pink, pale in color, warm, and dry. (Eber Dep. pp. 11, 61).

Parkview has written nursing policies for its Emergency Department, which states that nurses need to take each patient's blood pressure, unless the patient is under six years of age. (Brookes Aff. ¶ 11; Exs. 13-15 to Brookes Dep.). As Makota was over six years of age, Parkview's Emergency Department's nurse's policies required that Makota's blood pressure be measured and documented as one of the vital signs during the initial assessment. (Brookes Dep. pp. 24, 25, 27; Exs. 13-15 to Brookes Dep.). Nurse Eber did not take Makota's blood pressure because she thought he

was less than six year old due to his appearance; he could not talk, was wearing a diaper, and weighed only 32 pounds. (Eber Dep. p. 63). Makota's date of birth was reported on each page of the primary Emergency Department records generated on December 26, 2005. (Exs. 2-4 to Eber Dep.).

Parkview's Emergency Department nursing policies also required a patient's vital signs to be reassessed at certain time intervals depending upon the patient's condition. (Brookes Dep. p. 28; Ex. 13 to Brookes Dep.). These policies required all of Makota's vital signs to be reassessed at least every 2 hours prior to discharge. (Brookes Dep. p. 28; Ex. 13 to Brookes Dep.). Nurse Eber failed to reassess Makota's vital signs prior to his discharge. (Eber Dep. pp. 16-17).

After Nurse Eber finished her nursing assessment, Dr. David Hurley, M.D. ("Dr. Hurley") came to evaluate Makota. (Bode Dep. p. 22). Dr. Hurley took his own history from Makota's mother and did his own examination of Makota. (Hurley Aff. ¶ 4; Pl. Ex. 6). Following his examination, Dr. Hurley ordered blood tests and a chest x-ray. (Hurley Aff. ¶ 4). Before the results of these tests were completed, Dr. Hurley's shift came to an end and was relieved from duty by Dr. Joachin Okafor, M.D. ("Dr. Okafor"). (Hurley Aff. ¶ 5). Before Dr. Hurley transferred the care over to Dr. Okafor, he advised Dr. Okafor of the history, examination, and the tests he had ordered for Makota. (Hurley Aff. ¶ 6). Dr. Okafor then

reviewed Makota's chart and examined him. (Okafor Aff. ¶¶ 4, 6).

Parkview's nursing policies required Makota's intake and output to be monitored and documented while at the Emergency Department. (Brookes Dep. pp. 28-30; Exs. 13-14 to Brookes Dep.). However, Nurse Eber claims she was unable to measure either his input or output while he was there. Nurse Eber did not document Makota's input because she didn't think Makota drank enough to measure his input. (Eber Dep. pp. 43-45). While under the care of Dr. Okafor, Makota vomited into a towel that his mother had provided for him. (Eber Dep. p. 31). Because he did this in the towel, Nurse Eber claims she was unable to measure how much he had vomited. (Eber Dep. p. 31). Nurse Eber was only aware that Makota vomited one time; however, Makota's mother stated that he threw up into the towel on three separate occasions. (Bode Dep. p. 57). Makota also had a single episode of diarrhea in the Emergency Department and did so into the diaper he was wearing. (Eber Dep. p. 25). The diarrhea appeared to have blood in it, so Dr. Okafor ordered a stool culture to test for infection, but the results of that test would not be back until the following day. (Okafor Aff. ¶ 6).

When the results of the x-ray and bloods test came back, Dr. Okafor reviewed them and made the diagnosis that Makota had acute gastroenteritis. (Okafor Aff. ¶ 7). Dr. Okafor did not believe this was an emergency medical condition. (Okafor Aff. ¶ 10).

Before deciding on a plan of care, Dr. Okafor talked to Makota's primary care physician, Dr. Dick, to discuss with him the evaluation, vital signs, the results of the lab work and the bloody stool. (Okafor Aff. ¶ 8). According to Dr. Okafor, Dr. Dick agreed with Dr. Okafor's diagnosis, but also suggested salmonella as a possible diagnosis. (Okafor Aff. ¶ 10). However, in answering written discovery, Dr. Dick did not state that he agreed with Dr. Okafor's diagnosis. (Dr. Dick's Ans. to Pls. First set of Int. ##'s 6, 11, 12). Dr. Dick then recommended that Dr. Okafor give Makota a dose of Rocephin, discharge Makota with instructions to have Bode bring Makota in to see Dr. Dick first thing the next morning. (Okafor Aff. ¶ 8). Dr. Okafor gave Makota the Rocephin, instructed Makota to see Dr. Dick in the morning, and encouraged Bode to give Makota as much Pedialyte as he could tolerate. (Okafor Aff. ¶¶ 8, 9). Bode was further instructed Bode to bring Makota back to the Emergency Department immediately if he had any problems. (Okafor Aff. ¶ 9). The details of this care are set out in the Emergency Department Note. (Pl. Ex. 6).

Bode and Makota left Parkview's Emergency Department at 9:30 p.m. (Pl. Ex. 6, Parkview Whitley Hospital Record) and arrived home at approximately 10:00 p.m. (Bode Dep. pp. 59, 60). Once Makota arrived at home he was given a glass of Pedialyte, which he drank, and at approximately 11:30 P.M. Makota and Bode went to bed. (Bode Dep. pp. 35, 36). Through the night Makota woke up a few times and

asked for more to drink, which Bode provided. (Bode Dep. pp. 36-37). The next morning Bode woke up at approximately 5:30 A.M., checked Makota, and when he felt fine she went to help get Michael Norris ("Norris") ready for work. (Bode. Dep. p. 27). After Norris went to work Bode decided to wake Makota, but when she went to give him a drink he just "fell over." (Bode Dep. p. 27). She could not get him to wake up so she called 9-1-1. (Bode Dep. p. 38). The paramedics arrived and began CPR in an effort to resuscitate Makota.

Makota was taken to Parkview Nobel Hospital, and arrived at 6:46 A.M. (Pl. Ex. 7, Parkview Nobel Hospital Record). Makota was given resuscitative efforts but they were unsuccessful and were stopped at 7:04 A.M. (Pl. Ex. 7). Makota's stool results came back at 10:45 A.M. on December 27, 2008 showed a positive finding for clostridium difficle (Okafor Aff. ¶ 3). It was determined that Makota had died from dehydration due to vomiting and diarrhea caused by clostridium difficle infection. (Def. Ex. 8, Certificate of Death).

Jeffery Brookes, M.D., ("Dr. Brookes") is the Chief Physician/Quality Officer at Parkview. (Brookes Aff. ¶ 1). Dr. Brookes acknowledges that the medical screening examination contemplated by the hospital's understanding of EMTALA takes place from patient triage through discharge. (Brookes Dep. p. 16). Not only did Parkview have nursing policies regarding Emergency

Department procedures, but it also had physician policies in effect with respect to the hospital's compliance with EMTALA. (Brookes Aff. ¶ 2). Pursuant to that policy and medical staff bylaws, only physicians who are credentialed to perform Medical Screening Examinations are permitted to perform such examinations. (Brookes Aff. ¶ 3). Emergency Department nurses and other staff are not permitted to perform Medical Screening Examinations. (Brookes Aff. ¶ 4). However, Dr. Brookes does expect the Emergency Department staff to comply with any applicable Emergency Department policies. (Brookes Dep. p. 25).

Both Drs. Hurley and Okafor were credentialed to perform Medical Screening Examinations in the Emergency Department at Parkview when Makota presented. (Brookes Aff. ¶ 5). It is within the medical judgment of the physician who performs the Medical Screening Examination to determine what history, examination and testing is needed in order to determine whether the patient has an Emergency Medical Condition, as defined by Parkview. (Brookes Aff. ¶ 6). It is also within the medical judgment of the physician who performs the Medical Screening Examination to determine whether the patient is in a stable condition and safe to be discharged from the hospital. (Brookes Aff. ¶ 7).

Dr. Brookes reviewed Makota's December 26, 2005, hospital chart. (Brookes Aff. ¶ 8). From his review, it appeared that Makota received Medical Screening Examinations from both Drs.

Hurley and Okafor. (Brookes Aff. ¶ 9). In Dr. Brookes' opinion, the testing and consultation that was done to Makota was comparable to what other patients with similar symptoms would have received. (Brookes Aff. ¶ 10). Further, it is Dr. Brookes' opinion that the examination and testing done was designed to identify acute and severe symptoms that would alert doctors to situations that would require immediate attention to prevent serious harm or death. (Brookes Aff. ¶ 10).

Both Dr. Hurley and Dr. Okafor were of the opinion that they had sufficient information to perform an appropriate medical screening examination. (Hurley Aff. ¶ 9; Okafor Aff. ¶ 13). If either of these men thought they needed further information from a specific test, like blood pressure, they would have ordered the test to be done. (Brookes Aff. ¶ 9; Okafor Aff. ¶ 13).

Dr. Brookes acknowledged that low blood pressure could be a sign of severe dehydration. (Brookes Dep. p. 7). He further acknowledged that low blood pressure could be a sign of shock. (Brookes Dep. p. 7). Severe dehydration can constitute a medical emergency requiring immediate IV hydration. (Ex. 20 to Brookes Aff.). Dr. Brookes also stated that the vital signs of a six year old child who is the size of Makota could materially change over the course of time Makota was at Parkview's Emergency Department on December 26, 2005. (Brookes Dep. p. 34). In fact, the reason why Parkview has a policy of reassessing vital signs intermittently is

to see if those signs have changed over a period of time.  (Brookes
Dep. pp. 34-35).


Summary Judgment Standard

The standards that generally govern summary judgment motions
are familiar.  Pursuant to Rule 56(c) of the Federal Rules of Civil
Procedure, summary judgment is proper only if it is demonstrated
that there is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law.  *See
Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322-23 (1986).  In other words, the record
must reveal that no reasonable jury could find for the nonmovant.
*Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th
Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,
250 (1986).  In deciding a motion for summary judgment, a court
must view all facts in the light most favorable to the nonmovant.
*Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De
Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of
"the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits," if any, that the
movant believes demonstrate an absence of a genuine issue of
material fact.  *Celotex*, 477 U.S. at 323.  Once the movant has met
this burden, the nonmovant may not rest upon mere allegations but

-13-

"must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.

The Emergency Medical
Treatment and Active Labor Act ("EMTALA")

Congress created EMTALA, 42 U.S.C. section 1395dd, to deal with patient dumping, which is the practice of hospitals refusing to treat patients who could not pay for treatment by either

-14-

transferring them to another hospital or dismissing them from the hospital in an unstable condition. *Johnson v. University of Chicago Hosp.*, 982 F.2d 230, 233 n. 7 (7th Cir. 1993). Although this statute was prompted by concern for the poor, the provisions of EMTALA protect all individuals. *Bryant v. Adventist Health System/West*, 289 F.3d 1162 (9th Cir. 2002). EMTALA imposes two duties on certain federally-funded hospitals. First, hospitals must provide "an appropriate medical screening" examination within the capability of the hospital's emergency department. 42 U.S.C. § 1395dd(a). This examination is intended to determine whether an emergency medical condition exists and the proper inquiry is whether the patient received uniform treatment as other similarly situated patients would, not whether the treatment received was good or bad. *Bryant*, 289 F.3d at 1164. Second, if the hospital determines that an individual has an emergency medical condition, then the hospital must either stabilize the medical condition, or arrange for the transfer of the individual to another medical facility. 42 U.S.C. § 1395dd(b)(1).

Plaintiffs claim Parkview violated both of its duties under EMTALA. First, they argue that Makota did not receive an appropriate medical screening. Alternatively, Plaintiffs argue that Parkview released Makota in an unstable condition in violation of EMTALA. Each of these arguments will be addressed in turn.

A genuine issue of material fact
exists as to whether Parkview's Emergency
<u>Department gave Makota an appropriate medical screening</u>

EMTALA states that:

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency
department, if any individual (whether or not eligible for
benefits under this subchapter) comes to the emergency
department and a request is made on the individual's behalf
for examination or treatment for a medical condition, the
hospital must provide for an appropriate medical screening
examination within the capability of the hospital's emergency
department, including ancillary services routinely available
to the emergency department, to determine whether or not an
emergency medical condition (within the meaning of subsection
(e)(1) of this section) exists.

42 U.S.C. § 1395dd(a) (2003).

To comply with the screening requirement, hospitals must
perform an "appropriate medical screening." While Congress did not
specifically define the content of that phrase, the courts have
reached a general consensus on a method of assessing the
appropriateness of a medical examination. There is no national
"appropriate medical screening" standard; rather, the inquiry is
based on the capabilities of the particular hospital at issue. A
hospital can define which procedures are within its capabilities
when it establishes a standard screening policy for patients
entering the emergency room. *Repp v. Anadarko Municipal Hospital*,
43 F.3d 519, (10th Cir. 1994). A hospital will be deemed to have
given an appropriate screening, as required by EMTALA, if "its
standard screening procedure is applied uniformly to all patients

-16-

in similar medical circumstances." *Baber v. Hosp. Corp. of America*, 977 F.2d 872, 881 (4th Cir. 1992). Generally, "departure from standard screening procedures constitutes inappropriate screening in violation of the Emergency Act." *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir 1991). However, when a departure from the standard screening procedures is only a slight deviation -de minimis- there is no violation of EMTALA. *Repp*, 43 F.3d at 523; *Magruder*, 243 F.Supp.2d at 892-893. A deviation is considered de minimis when it is merely formalistic and the policy at issue had been effectively followed. *Repp*, 43 F.3d at 523.

Plaintiffs argue that Parkview violated EMTALA because it deviated from its standard screening procedures and those deviations were not de minimis. First, Plaintiffs point to the fact that Parkview's Emergency Department policies required that Makota's blood pressure be measured as one of his vital signs during his initial assessment, but neither Eber nor anyone else measured Makota's blood pressure while he was in the Emergency Department. Plaintiffs also point out that Parkview's Emergency Department policies required Makota's vital signs to be taken every two hours; however, none of Makota's vital signs were reassessed at any time prior to his discharge. Plaintiffs further complain that the hospital staff failed to measure Makota's intake and output of fluids, as policy required.

While Parkview admits these deviations, it argues that they are de minimis because: (1) they were committed by the nursing staff; and (2) the deviations had no bearing on the testing that Dr. Hurley and Dr. Okafor determined was necessary to complete an appropriate medical screening examination. It is Parkview's contention that "the function of a nurse in the Emergency Department is not to provide a medical screening examination but to provide the physician performing the medical screening examination with the information that the physician deems necessary to complete that examination." (Parkview Reply, p. 3). However, Parkview's general proposition that the division of labor between a physician and a nurse is such that a nurse's failure to comply with hospital policy cannot give rise to an EMTALA claim is without merit. See e.g. *Repp*, 43 F.3d at 519(considering whether nurses' failure to ask specific questions about a patient's pre-existing conditions and medications is a de minimis violation of EMTALA).

According to Dr. Hurley and Dr. Okafor, they had all of the information they needed from Makota to complete an appropriate medical screening. Parkview argues that if Makota's blood pressure reading was necessary or if his vital statistics needed to be reassessed, then Dr. Hurley and Dr. Okafor would have ordered those tests. However, even if the doctors could make a thorough and accurate medical screening without Makota's blood pressure reading, the deviation of policy still makes this a violation of EMTALA if

the deviation was more than de minimis. The quality of the screening is not what is being questioned, what is being questioned is if there is uniformity in the screenings. *Brenord v. Catholic Medical Center of Brooklyn and Queens, Inc.*, 133 F.Supp. 2d 179, 186 (E.D.N.Y. 2001). A bad medical screening will be addressed through medical malpractice suits. *Curry v. Advocate Bethany Hosp.*, 204 Fed. Appx. 553, 556 (7th Cir. 2006). Similarly, a good screening will not stop a violation of EMTALA from occurring, if a patient with similar symptoms got a better screening then EMTALA has been violated because there has been a lack of uniformity. *Baber*, 977 F.2d at 881. Parkview's arguments regarding what Dr. Hurley and Dr. Okafor thought were required for them to make an appropriate medical screening is not enough to erase the material question of fact of whether Parkview performed an appropriate medical screening under EMTALA.[1]

_____

[1]This Court is well aware that Parkview is attempting to rely on one of its policies, which states only qualified medical personnel can conduct emergency medical screenings, in an attempt to circumvent or override its other policy, which states all patients over the age of 6 need to have their blood pressure taken and vital signs reassessed at least every two hours. Such a premise is untenable for EMTALA purposes in resolving the instant motion.

Dr. Okafor's and Dr. Hurley's professional medical opinion as to what they believed was or was not necessary for them to perform an emergency medical screening of Makota is not enough to alleviate the need for Parkview to comply with its own standard procedures as a matter of law. Indeed, just because Dr. Okafor and Dr. Hurley believed that they did not need Makota's blood pressure reading or reassessed vital statistics does not mean that Parkview can deviate from performing those tests, both of which are required by the hospital's policy. To accept

The fact that patients are supposed to have their blood
pressure taken and vital statistics reassessed in accordance with
Parkview policy shows that Makota was given disparate treatment in
his screening and there has been a potential violation of EMTALA.
*Id*. Plaintiffs argue that because blood pressure is something that
could have shown a sign of dehydration- the cause of Makota's
death- Parkview's failure to take Makota's blood pressure raises a
material question of fact. This Court agrees.

By definition, a de minimis change is something that is so
insignificant a court may overlook it when deciding a case. <u>Black's
Law Dictionary</u> 464 (8th ed. 2004). Relying on more than definition
alone, case law illustrates that Parkview's failure to take
Makota's blood pressure and reassess his vital statistics are not
de minimis deviations as a matter of law.

The Tenth Circuit's opinion in *Repp* is the seminal case
regarding what constitutes a de minimis deviation from a hospital's
normal standards. 43 F.3d 519. In *Repp*, the patient alleged an
EMTALA claim based on two departures from the hospital's normal
standard. *Id.* at 523. The two deviations were that the hospital did
not get a full medical history from the patient and nurses did not

_____

Parkview's position would essentially negate the approach courts
have adopted to examine EMTALA claims: uniformity of policy.
This would, in effect, allow physicians to override standard
hospital policies in exchange for their professional opinion.
Such a proposition is contrary to the EMTALA framework and,
instead, more appropriately considered in the medical malpractice
context.

ask for a complete list of medications the patient was taking. *Id.*
The court decided these were de minimis deviations because even
though the nurses did not specifically ask for this information,
they nevertheless received this information. *Id.* The patient's
wife had given the nurses the information on the patient's medical
history and what medication he was taking without the nurses
needing to ask for it. *Id.* The Tenth Circuit explained that
because the policy of documenting the patient's medical history and
list of medications had been effectuated, the deviation of how that
information was received was merely formalistic. *Id.* The court
went on to hold that such formalistic deviations are de minimis and
not actionable. *Id.*

De minimis deviations have also been addressed in a district
court within this Circuit. *Magruder*, 243 F.Supp.2d at 886. In
*Magruder*, a mother and father brought their child to the emergency
department for diagnosis and treatment of redness and tenderness in
their child's groin area. The hospital had a policy for screening
children under two that included taking off the child's diaper in
order to weigh him. The hospital had deviated from its standard by
not taking the child's diaper off to weigh him. *Id.* at 892-893.
The complaint was that by not taking the diaper off, no assessment
of the groin area could be performed. *Id.* at 893. However, Dr.
Ahler testified that during the examination he fully assessed the
child's groin area and also fully assessed the child's level of

pain. *Id.*

The court determined the failure to remove the child's diaper to weigh him, contrary to hospital policy, was a de minimis deviation because the emergency department doctor on duty performed an independent examination of the child's groin area. *Id.* Even though the policy was not followed, the child was examined in a way that there was no dissimilar treatment to the child's examination from other patients with similar symptoms. *Id.* at 895.

Unlike the cases in both *Repp* and *Magruder*, Parkview did not get the material information. In *Repp*, while the deviation did occur, the alleged danger of not knowing the patient's medical history or what medication he was taking did not occur. In *Magruder*, the alleged harm, that the doctor would not examine the child's groin, also did not occur. Simply, in those cases, even though there were formalistic deviations, the policies were still effectively followed. That is, the hospital received the information the policy intended the hospital to gather; it was merely gathered in another manner.

Here, Parkview never determined what Makota's blood pressure was, although it was required to do so because he was six years old. The fact that Makota's blood pressure was not taken is a deviation because similar patients with similar symptoms would have had their blood pressure taken. Blood pressure is information that could help in forming a diagnosis, but was not gathered in some

-22-

other way like in the deviations of *Repp* and *Magruder*.  This Court
cannot say it is a de minimis deviation as a matter of law.

Similarly, the fact that Parkview did not reassess Makota's
vital signs, as is required by Parkview policy, raises a question
of fact.  The reassessed vital signs could give information to a
doctor to help with the diagnosis.  Dr. Brookes admitted that
Parkview reassesses a patient's vital signs to see if they have
changed, which is a possibility.  Dr. Brookes stated that a change
in vital signs could be material and critical. Other patients would
have had their vital signs reassessed every two hours, but Makota
did not. Other patients would have had their vital signs reassessed
by a nurse or doctor and had that information added to all
pertinent information to determine a diagnosis.


Parkview was not required by
EMTALA to stabilize Makota before releasing him.

Plaintiffs make the argument that Parkview knew that Makota
was in an unstable condition when they discharged him.  Plaintiffs
rely on a combination of Brookes' deposition and the Center for
Disease Control article entitled "Managing Acute Gastroenteritis
Among Children," ("MAGAC") which appeared in the Morbidity and
Mortality Weekly Report.  Brookes admitted that he considered MAGAC
to be authoritative, in as much that everything he had read from
the organization had been authoritative.  (Brookes Dep. pp. 35-37).
Plaintiffs then use this manual to argue that Dr. Hurley and Dr.

Okafor knew that a child with bloody diarrhea is at high risk for complications including sepsis and other systemic diseases. (Caleb K. King, M.D., *Managing Acute Gastroenteritis Among Children*, Morbidity and Mortality Weekly Report, November 21, 2003, at 11). Plaintiffs also state that Eber reported that Makota looked lethargic when he was released. (Parkview Whitely Hospital Record). Plaintiffs argue that a lethargic condition is a recognized sign connected with severe dehydration. (*Id.* at p. 5, Table 1). Parkview argues in response by using the affidavits of Dr. Hurley and Dr. Okafor to claim that they did not know Makota had a medical condition.

EMTALA states:

(b) Necessary stabilizing treatment for emergency medical conditions and labor

(1) In general
    If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--

        (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
        (B) for transfer of the individual to another medical facility in accordance with subsection © of this section.

42 U.S.C. § 1395dd(b)(1) (2003).

The statute requires that the hospital must determine that a patient has an Emergency Medical Condition for liability to apply when a patient is released from the hospital in an unstable

condition. *Id.* The statute's language is clear that actual knowledge must be present, as "a hospital *determines* that the individual has an emergency medical condition . . .." (*Id.*, emphasis added). Numerous courts have acknowledged this and found that liability can only be found when the emergency nature of the condition is detected, and the hospital then fails to stabilize that known emergency condition. *Gatewood,* 933 F.2d at 1041; *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir. 1990); *Magruder*, 243 F.Supp. 2d at 894.

Dr. Okafor had made a diagnosis and determined that there was no emergency medical condition. Plaintiffs' argument that there is an authoritative manual that points to the correct diagnosis is not enough to show that there was actual knowledge on Parkview's behalf. Even if Dr. Brookes knew of the manual and thought it was authoritative, Dr. Okafor had made the diagnosis. (Okafor Aff. ¶ 7). It is undisputed that Dr. Okafor's diagnosis is what Parkview officially thought Makota was ailing from. The diagnosis does not have to be correct for a hospital to be in compliance with EMTALA. *Curry*, 204 Fed. Appx. at 556. There is nothing in the record to support the allegation that Parkview had actual knowledge that Makota had an emergency medical condition. As a result, there has been no violation of EMTALA for failure to stabilize.

<u>CONCLUSION</u>

For the reasons set forth above, the motion to strike is **DENIED**. The motion for summary judgment is **GRANTED in part and DENIED in part**. To the extent the motion seeks summary judgment on Plaintiff's claim that Defendants failed to perform an appropriate medical screening under EMTALA, the motion is **DENIED**. To the extent the motion seeks summary judgment on Plaintiff's claim that Defendants failed to stabilize under EMTALA, the motion is **GRANTED**.

**DATED:  March 23, 2009**          **/s/RUDY LOZANO, Judge**
                                    **United States District Court**